## FIRST NAT. BUILDING CORPORATION v. JONES, Collector of Internal Revenue.

No. 6534.

District Court, W. D. Oklahoma.

Feb. 3, 1941.

Kent W. Shartel, Earl Pruet, and Hayes, Richardson, Shartel & Gilliland, all of Oklahoma City, Okl., for plaintiff.

George H. McElroy, Asst. U. S. Atty., of Oklahoma City, Okl., and Lester L. Gibson, Sp. Asst. to the Atty. Gen. (Charles E. Dierker, U. S. Atty., of Oklahoma City, Okl., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe, Sp. Asst. to the Atty. Gen., on the brief), for defendant.

VAUGHT, District Judge.

This action was filed on the 18th day of April, 1938, for the recovery of additional income tax for the year 1934 in the sum of $3,504.08 paid under protest by the plaintiff to the defendant. The tax sought to be recovered was paid pursuant to a deficiency assessment made by the Commissioner of Internal Revenue for said year.

The income was derived from the operation of a 33-story office building in the city of Oklahoma City, Oklahoma. In making its income tax return for the year 1934, the taxpayer had estimated the useful economic life of said building at 40 years and the rate of depreciation for wear, tear and obsolescence at 2½ per cent. per annum.

The Commissioner of Internal Revenue estimated the economic useful life of the building in question at 66⅔ years and the rate of depreciation at 1½ per cent. per annum. By so decreasing the rate of depreciation, he increased the amount of tax $3,504.08, for which a deficiency assessment was made.

The issue for determination in this case, therefore, is the useful economic life of the building in question.

█ This becomes largely a question of fact under the rules and regulations of the Treasury Department. In January, 1931, the Treasury Department issued a bulletin designated Depreciation Studies, Preliminary Report of the Bureau of Internal Revenue, and in this bulletin it set out not only the basis of depreciation, but gave general information from which the taxpayer could determine under what heading or class various types of property should be classified. On page three of this pamphlet, under the heading "buildings", are listed various types and character of buildings. It includes office buildings and, under the classification "masonry, brick, concrete, reinforced concrete, brick and steel, steel frame, steel and stucco (fireproof)", fixes the probable useful life of such building at 40 years and the depreciation rate at 2½ per cent.

This was followed by the taxpayer for the year 1934 as well as for the years 1932 and 1933. A rate of depreciation of 2½ per cent. for the years 1932 and 1933 was approved by the Commissioner, no objection having been made to the report for either year.

It will be noted that on page three not only buildings are classified for depreciation purposes but building equipment (elevators, heating systems, lighting systems, fire equipment, et cetera), is also classified for the same purpose, clearly showing that the classification was on a unit basis and not a composite basis.

It is the contention of the government that while this publication was issued for the purposes stated, the taxpayer has misconstrued the depreciation studies and that the Department intended to designate the rate and life on a composite basis and not on a unit basis.

Mr. G. E. Ruggles, valuation engineer for the Bureau of Internal Revenue, testified that the rate given in the table contained in the Department publication is a composite rate and that, therefore, since the fixtures and equipment would carry a life of a much shorter period and greater percentage of depreciation, the building proper would have a much longer life and a smaller percentage of depreciation.

The engineer's statement is not supported by the record itself. In clear and unmistakable terms, the table sets out the unit rate both for the building and for the equipment, and the explanatory pages preceding the table state that it is a unit rate. Sections of the bulletin are as follows:

"A reasonable rate for depreciation is dependent not only on the prospective useful life of the property when acquired, but also on the particular conditions under which the property is used as reflected in the taxpayer's operating policy and the accounting policy followed with respect to repairs, maintenance, replacements, charges to the capital account and to the depreciation reserve. If the useful life of each of the various classes of assets shown hereafter could be determined precisely, which can not be done, there still could not be established a standard rate of depreciation for each character of asset unless there existed standard methods of operation and

of accounting from which there could be no deviation."

\*　　\*　　\*　　\*　　\*

"It has been found that in certain classes of exhausting assets, obsolescence, rather than ordinary wear and tear, becomes an important factor in determining the allowance. The probable useful life and the rates of depreciation based thereon include an allowance for normal obsolescence. They do not include any allowance for sudden or extraordinary obsolescence, such as is occasioned by revolutionary inventions, abnormal growth or development, or other unpredictable factors which materially lessen the probable useful life of property. (See Bulletin F, revised, for discussion of the two types of obsolescence.) For instance, the normal useful life of an office building, apartment, or any other building leased to tenants may be materially lessened by the erection of newer buildings of radically different styles, involving greater efficiency of layout and operation. A pronounced shift in the business district, or character of the neighborhood, may render the building unfit for the purpose for which it was erected or for any other equally valuable use. Accordingly, the depreciation rates shown should be modified to give full effect to extraordinary obsolescence affecting the useful life of particular assets.

"While the following pages tabulate a large number of individual items of property subject to depreciation, it is not intended that taxpayers must set up property accounts in such detail. It is hoped, however, that the lists of assets shown will assist taxpayers in grouping their assets having the same uses and life under separate accounts, to the end that the portion of the depreciation bases of plant and equipment extinguished during the year may be determined with some degree of accuracy, *which is not possible when a composite rate is applied to mixed property* composed of assets in which there exists great variation in the life thereof. With such groupings the verification of the depreciation deductions will be facilitated, and, what is of more importance, taxpayers will be able to give full effect to their own experience and the developments within their industry which may affect all or only part of their assets from year to year. (Emphasis supplied.)

"These statistics represent the results of the bureau's depreciation studies over a 5-year period, made with the cooperation of a number of trade associations and corporations, and covering a range of years beginning prior to the adoption of the sixteenth amendment to the United States Constitution and extending down to date."

Numerous witnesses testified for the plaintiff and for the defendant, relative to the size of the city, the location of the building, its probable and reasonable revenue from rentals, its percentage of occupancies, the character of the building, and most of the witnesses gave their opinion as to what might be termed the useful economic life of the building.

A short history of the building and a general statement, with reference to the matters testified to, would be proper at this time.

This building was erected in the years 1931 and 1932 at a total cost in excess of $3,000,000. It is a 33-story office building with the first floor and the basement constructed for the accommodation of the First National Bank.

It was partially occupied in 1932, and in 1933 the occupancy increased gradually, but in both of those years no profit of any character was disclosed by the income tax reports. In 1934 the percentage of vacancies was 41.4 per cent.; in 1935, 37.71 per cent.; in 1936, 33.24 per cent.; in 1937, 29.62 per cent.; in 1938, 29.52 per cent.; in 1939, 29.84 per cent.; and, in 1940, 30.70 per cent. The gross revenue derived from the building was as follows: in 1934, $394,543.35; in 1935, $417,440.64; in 1936, $457,838.28; in 1937, $485,714.64; in 1938, $474,120.24; and, in 1939, $465,068.40.

The report for 1934 showed a valuation of $3,056,543.39, income of $394,543.35, expenses of $393,421.50, and a net profit of $1,121.85. The auditor included in the item of expenses, depreciation at the rate of 2½ per cent.

This building was erected at the beginning of what is commonly known as the depression. The city had had a phenomenal growth from 1920 to 1930. The oil field was discovered in and near Oklahoma City in the year 1929, and the latter part of the year 1929 and the years 1930 and 1931 were exceedingly prosperous for the city. The building business had an unusual boom. In addition to the First National Building, the Ramsey Tower, a building of some 32 or 33 stories, was

built at practically the same time. The Perrine Building, immediately across the street from the First National, had been completed only a short time before. Many other new buildings had been erected.

In the year 1900 Oklahoma City's population was 10,037; in 1910, 64,205, or an increase of 539 per cent.; in 1920, 91,295, or an increase of 42 per cent.; in 1930, 185,389, or an increase of 103 per cent.; and in 1940, 204,517, or an increase of 10.3 per cent. This presents a very interesting yet a very uneven rate of growth. While the population increased 103 per cent. between 1920 and 1930, it increased only 10 per cent. from 1930 to 1940. With the wonderful growth evidenced by the report in 1930, the plaintiff had reason to expect that this growth would continue during the next ten-year period, but that same rate of growth did not materialize.

The testimony further discloses that this building is located near the center of the business district of Oklahoma City but during the past twenty years the business center has shifted approximately three blocks. The shift has been gradual but it has been positive. The evidence further shows that the trend now is definitely north and west. Many new business enterprises have been developed in the residence sections. Twenty-third Street from the State Capitol Building westward for practically ten blocks has been made more or less a business district. Many of the leading institutions in the city have branches on Twenty-third Street and in other residence sections. Many office buildings have been erected in residential sections. In other words, the business of Oklahoma City, instead of being centralized within a small space, has begun to spread out over the city. There are numerous reasons for this. People have practically forgotten how to walk and they like to do business with institutions where there is plenty of parking space, and as conveniently to their homes as possible. These are little things but they show a definite trend, not only in Oklahoma City, but in many other American cities.

The plaintiff insists that 40 years is the reasonable economic life of this building. That does not mean that the building would not be standing after 40 years, but it means that it could not be operated on a productive basis for a longer period than 40 years.

There are many things to take into consideration. The evidence discloses that the type of building is now changing and instead of the erection of tower buildings, that is, extremely tall buildings, it has been found more economical to erect buildings of 20 stories or less. At the time this building was erected, air conditioning was in its infancy, and it evidently was not constructed with the idea that air conditioning would be necessary in the future. Testimony of expert witnesses was that it would be a very expensive proposition to air condition the building to-day and estimated generally that it would cost from $500,000 to $600,000. Another item of expense that cannot be overlooked is the upkeep and constant repair of a building of this type. The older the building, the more obsolete certain of its features become. We are confronted, also, with the fact that in 1940 more than 30 per cent. of the building was vacant, as compared with 41 per cent. in 1934, and that the percentage of vacancies in 1940 was greater than in 1939, 1938, and 1937, showing that the tendency toward vacancies has increased since 1937.

Mr. Ruggles also testified that if there should be a standstill or a decrease in the population, the tendency would be to fill buildings of this type and vacate the less modern buildings, and stated: "I do not believe the First National Building will become obsolete if no other new buildings are built. If the town should move away from it, it would become obsolete. If the depression continues and the owners of other buildings, in order to meet operating expenses and pay taxes, reduced rents below that the First National is receiving, and a good many tenants should leave the First National Building, I would consider that fact obsolescence in determining the question of depreciation regardless of whether any other buildings were built, provided it reduced the tenancy of the First National Building below a point where it could operate profitably. You can anticipate obsolescence sometimes and sometimes you cannot."

This presents exactly the question for determination in this case. Witnesses for the plaintiff testified that various lines of business are decreasing; that much of the business heretofore handled by individuals is now being handled by the government; that hundreds of lawyers and

other professional men in Oklahoma City have found it necessary to reduce their office expenses and many have moved and are moving from the more expensive office buildings into less commodious and expensive quarters. This building after 40 years might be a good building and at the same time be obsolete to the degree that term has been defined by the Revenue Department.

Since this is a question of fact to be determined from the evidence, I have no difficulty in concluding that the erection of the First National Building, while at the time it was built may have been regarded as a good business proposition, in the light of what has occurred since its erection, it was a most hazardous undertaking from a business standpoint. It is a building for a city of 250,000 to 500,000 population. It would be a credit to many cities of a million population but it is a permanent fixture in a city of from 200,-000 to 250,000 population. As indicated by Mr. Ruggles, obsolescence is something that cannot be determined definitely.

The court cannot agree with the government's expert witness that a continuance of the emergency or the failure to increase in population at a reasonable rate would affect other office buildings before it would affect the First National. Courts are not expected to close their eyes or ears to knowledge which they have gained from their own experience, and observation teaches us that a depression affects the little man first and those who could not afford to maintain offices in the more expensive buildings would necessarily retire to buildings providing cheaper rent. This would affect plaintiff's building in that it would decrease the percentage of occupancies and in the end would decrease the rate of rentals from that now charged.

Taking all of these facts into consideration, an economic life of 40 years is reasonable for this building and apparently that was the attitude of the Treasury Department when it issued its bulletin in 1931, therefore, a depreciation rate of 2½ per cent. is found to be a reasonable rate in this case.

Judgment will be rendered for the plaintiff and an exception allowed. A form of judgment together with findings of fact and conclusions of law, consistent with this opinion, may be submitted within ten days from this date.